This is 4-180563, State of Illinois, XRL Wolfey and Xanders v. Ameresco. On behalf of the Avalanche, Mr. Craven, good morning. On behalf of Appalachee, David Horman and Christopher Turner. And have you divided up your times? Yes, we have your order, 10 minutes each. Alright. Mr. Craven. Thank you, may it please the court. Counsel. This case presents this court with the opportunity to examine a pair of statutes and come to a decision which gives the intended purpose of both of those statutes the greatest play possible. The False Claims Act is intended to encourage citizens to come forward with information about false or fraudulent claims being presented to government bodies. To that end, those citizens who successfully prosecute those claims are provided, by the terms of the statute, a percentage of the claims recovered on behalf of the deferred government bodies. Built into that statute is the so-called Public Disclosure Card, which is intended to disallow so-called parasitic plaintiffs, a term I'm sure you will hear more than once from opposing counsel, from taking advantage of information readily available and pursuing those claims on behalf of the government body. There is good reason for the False Claims Act, and there is equally good reason for the Public Disclosure Card. Citizens should not be allowed to recover a percentage of a claim when they rely on publicly available documents such as indictment studies, OEIG reports, etc. There is also the Freedom of Information Act in play here, which has as its stated purpose to disclose the fully-confirmed information regarding the affairs of government. Preamble to that statute states, such access is necessary to enable the people to perform their duties of discussing public issues fully and freely, making informed political judgments, and monitoring the government to ensure that it is being conducted in the public interest. Thanks to the General Assembly and this Court's decision in Rushton v. Department of Corrections by the Supreme Court, FOIA now extends to documents that have never been in the possession of the public body, that the public body may not have any knowledge of, and in fact may not know anything about. The question presented by the facts of this case is the question which divided the United States Supreme Court. Is any use of a FOIA request to gain information about an alleged false claim an absolute bar to a citizen proceeding with a claim under the False Claims Act? The Supreme Court decided that it was in the Silver Elevator case. In the setting justices in that case were of the opinion that there are instances, based on the facts of each case, in which the use of a FOIA request to gain information should not act as an absolute bar. That dissent was at page 18 and 19 of our brief. The facts of this case belie the assertion that individuals who are not original citizens and who obtain information through FOIA requests will generally not be persons with first-hand knowledge of fraud, but rather will be opportunistic litigators, the so-called parasitic tycoons. The facts also illustrate how an overbroad reading of a jurisdictional bar would prevent an individual with independent but partial knowledge of a possible fraud would be barred from bringing a lawsuit that is neither parasitic nor fervent. The facts of this case make it clear that the dissent in Schindler had it right. There are, in fact, cases in which the use of a FOIA request should not be an absolute bar in the pursuit of a FOIA claim. Rather, these cases, like FOIA cases themselves, should be judged on the impacts presented in the case. This court, in the Rushton case I cited earlier, adopted the holding of the second district in the Chicago Tribune, DuPage County case. We are hesitant to adopt the sweeping pronouncement of bilateral law in this case, because it might be insufficiently flexible to account for the myriad of government entities to use FOIA blockers to say nothing of the individualized governmental functions they each perform. We believe that such analysis must be subject to, in fact, intensive inquiry. This court went on to say that to examine the facts of that case and conclude that, based on the unique and undisputed facts of this case, we conclude that the settlement agreement, which was in the possession of a country, had never been in the possession of the public body, had never been viewed by the public body, and, in fact, Wexford refused to give DOC a copy of the contract. And this court held that, under the facts of that case, that contract was never blessed because of records such as this one. I urge this court to adopt that same fact-specific inquiry with respect to the application and the use of a FOIA request in a False Claims Act case. It's important to keep in mind that one of the things that drove Justice Ginsburg's dissent in the Schindler case is that in an FCA case, a False Claims Act case, as in all cases involving allegations of fraud, there's a heightened leniency demanding that plaintiffs that they claim specific facts alleging the elements of that fraud. In this case, particularly in the Chatham case, a FOIA request was only to gain access to the contract underlying the fraud perpetrated on that school board. Justice Gordon, in the Lyons Township case, indicated that the public disclosure of fraud was to eliminate parasitic lawsuits based on information of which the government was well aware. We've established that in this case, the government was not aware of several specific findings. Members of the school board did not have the complete contract when they approved it. They had only the initial part of the contract. They did not, the sections of the contract, the attached schedules related to the taxpayer protections in Section 19B. Can you comment on the relevance of the timing of when they became aware of the contracts relative to the time of filing of the complaint? I mean, what is the relevance of that fact, that they didn't have the contracts at the time, in terms of the viability of a False Claims Act? I think it's important that they didn't have it. I think it's important to demonstrate why they didn't have it, because of the complicity of the superintendent in hiding the contract from the... But how does that impact on the later application of the public disclosure bar, when those contracts are then made known? When they were made known, we didn't get... We filed a FOIA request. We didn't get it when we filed a FOIA request. We filed a FOIA application. They gave us a box of documents. We didn't get that contract until well after Mr. Gilman was out of the district. And they were going through a box of records that came across eventually that said the That's when we got it. I don't think that the members of the school board, I know the members of the school board, didn't have it before that time, which was about the time that this FCA litigation was conducted. The attorneys from the school board, and don't ask me why, but the attorneys from the school board didn't have the schedules at the time this contract was approved by the school board. The contract clearly says, see you have schedules. Nobody saw them. Nobody had them except, we believe, Mr. Gilman, the school superintendent. And after the contract was approved, the Amoresco rep on this contract asked Superintendent Gilman to move the contract to a less public part of the school's district's website, and he concurred and wrote back and said, I've taken it down. It's not available to the public. We made a request. We made a FOIA request. The FOIA officer didn't have the contract, didn't have the schedules. All she provided to us was the front part of the contract. I refer to another element that the school board was not aware of and became available only as a result of a FOIA request was that even though Mr. Gilman, the superintendent, was the superintendent of the Chatham schools, traveling at the expense of the Chatham school district to a conference in Texas, he was showing for Amoresco, going to see if they could get him to go see another superintendent in Texas, extolling the virtues of Amoresco and the way to construct these deals. In the Taylor Bill case, again, the only way to get a copy of the contract to determine what happened here was to file a FOIA request. Even when we filed a FOIA request, the superintendent denied it, provided part of the contract, but not the schedules nor the sections of the contract in which the school district stipulated, if you can stipulate, the savings and stipulated the way the bond requirement, stipulated the way the other savings to the taxpayers, the protections of the taxpayers. Only when we put in the FOIA litigation was that contract produced and only then did we know that the Taylor Bill contract started as a $100,000 contract and then ballooned rather quickly with a change order for $11 million. A $100,000 contract with an $11 million change order, which is a clear violation of state law and restrictions on the use of change orders and the size of change orders relative to the size of the initial contract. It also remains a mystery as to how Taylor Bill would recapture over $11 million or over $12 million in energy and operational savings over a 20-year period. That's just an enormous amount of money in savings over a 20-year period in energy and operational expenses from the contract, which included building a new building and paving a parking lot. I'm not quite sure how we have operational savings or utility savings from paving a parking lot or from building a new building. There are some things that obviously the contracts came to a FOIA request because that's the only way we could get them. There are other things that we were able to present outside of that FOIA request. For instance, the affidavits from the school board members that they did not have the schedules at the time that this contract was presented to them. The affidavit from Mr. Kearns, the Amoresco representative who was told at the last minute to go to the school board meeting to represent Amoresco when the contract was being approved. He was notified at the last minute to go. He did not have a copy of the contract, and he presented this contract to the board as which is to say, you've got to measure the energy and operational savings. You've got to have a bond. You've got to have payments spread over time. In response to a question, what happens if the savings don't meet the expenses of the contract, he looked at the school board, looked them in the eye, and said, we write you a check, which is absolutely required by the statute and which had been stipulated away in those schedules for the contract that nobody on the school board, nor the counsel to the school board, had ever seen. I would urge this court to adopt the same sort of fact-flexible finding that this court and the Supreme Court adopted in the FOIA case involving the Department of Corrections. I think there are facts, I think there are cases in which an absolute bar to the use of FOIA in a false claims act case is simply too strict and should not be the policy adopted in the state of Illinois. I need to take a couple of minutes to address the issue regarding the resolutions from the Supreme Court rejecting the dismissal of these cases under the public disclosure statute. I am well aware that the Attorney General is the sole representative of the state of Illinois in cases before this court or any other court, and I'm not taking the position that the Attorney General's office is not, nor that it shouldn't be. But the defrauded party in this case, defrauded parties in this case, are not the state. The state doesn't have the dog in this fight. The defrauded parties are the two school boards who paid $2,200,000 to Ann Arresto based on these contracts that don't come close to complying with Section 19B. Don't come close to providing the savings that are necessary under 19B. This argument presents a difficult conundrum. The statute says the court shall dismiss an actionable claim under this section unless opposed by the state. Ann Arresto and the Attorney General take the position, and by the way there's a capital S on state, take the position that that means the state of Illinois, and that means the Attorney General, and only the Attorney General, and nobody else can object. The court shall dismiss an actionable claim under this section unless opposed by the state. There are substantially the same allegations where transactions as alleged in the actionable claim were publicly disclosed. One, in a criminal, civil, or administrative hearing in which the capital S state or its agent is a party. Two, in a capital S state, legislated capital S state, Auditor General, or other capital S state report, hearing, audit, or investigation. Or three, from the news media, unless the action is brought by the Attorney General, or the person bringing the action, or the source of the information. If capital S state in the first sentence, the court shall dismiss an actionable claim under this section unless opposed by the state. If the state in that phrase means the state of Illinois and only the Attorney General can object, then there is nothing that makes reference in the rest of this section to disclosures from local governmental law. If capital S state means capital S state of Illinois, then it means capital S state in those exceptions involving criminal, civil, or administrative hearings where the state legislated state Auditor General or other state report. If state means state, disclosures by local governments are involved. And I would also note that nowhere in those exceptions or those limitations is the Freedom of Information Act specifically referenced. The interpretation of the federal statute by the U.S. Supreme Court includes the Freedom of Information Act as some sort of public disclosure. In one of these names, the state statute doesn't. Such a finding in the Illinois False Claims Act would be contrary to the purposes of the U.S. Supreme Court in the absence of further questions. You guys had a whole lot more questions in the previous cases. I heard my voice from you. Since you're asking. And the last point in terms of the state. It could be a school board. What about in this situation where you have two school boards? Do you have the potential that you could have conflicting positions as to whether or not the False Claims Act case proceeds? So how do you resolve that? Isn't that an indication that it truly is the Attorney General? If the Chatham School Board didn't want this case to proceed, they could say, we're not going to object to the dismissal. If the Taylorville School Board didn't want this case to proceed, they could say, we don't want this case, we're not going to object to the dismissal. Just as the Attorney General makes accommodations in these cases as to state agencies and state claims, some they pursue, some they don't pursue. Some they object to dismissal, some they don't object to dismissal. Coming back to point number one, each of these cases, each of these claims, needs to be decided with the facts of the claims presented in the trial on the various of these cases. Thank you. Thank you, Mr. Craven. You'll have an opportunity to rebuttal. Mr. Perlman. Good morning, Your Honor. Good morning, Your Honor. Good morning, Counsel. And we're assisting this court to affirm the interest of summary judgment and the entry in its favor in the motion to strike by the court here. Your Honor, this is not a whistleblower case. It's a parasitic lawsuit brought by an entrepreneurial opportunistic litigant here. They're not insiders. They're not whistleblowers. They don't have one piece of inside information to give them any knowledge, partial knowledge. Mr. Craven says nobody saw the schedules. Well, Your Honor, we disagree. You might, because we never got to the facts, you might believe that they're highly contested. As to the attachment concealment argument and Superintendent Gillum, let me just go through some of the facts for the court. The contract was originally sent to an employee named Dave Murphy from Amoresco on March 16, 2010. That was placed on BoardDocs. It's a website by Chatham. Mr. Zander on page 21 of his deposition says, asking about the contract, I believe they were revealed the contract was available on BoardDocs, but the attachments were not revealed until we did a FOIA. So, that was given to, the attachments were given on March 17. On March 22, there's transcripts in the record showing that the attachments in the contract were discussed in a closed board meeting. That was provided in FOIA responses. The resolution on March 22 was approved by the board, but contingent on review by Brown, Haynes, Stephens, the boards. And that's one of the two times they reviewed it. I want to make sure the second time I get to the court. So, they reviewed it before it was signed. Two months after it was introduced in the March meeting, it was executed, the contract was. The contract, if you look at the contract, just read the contract. It references attachments throughout. Anyone who read the contract knows there's attachments to it. If they didn't ask for the attachments, or want to see the attachments, legal counsel, individual board member, whatever, they could have asked for it and got them. No one who was involved with hiding these attachments from Amherst was alleged by... Could I ask a question in clarification? It may be obtuse about this. The attachments were later discovered by plaintiffs when? They were discovered... Well, they were provided. When we talk about discovered, they were provided through a FOIA response. And it's important because it was... It came to the board's attention, and Brown, Haynes, again, in 2014, was called on the carpet by the Chatham School Board, and said, does this comply with 19B? Rick Rinsenbach and Laura Lieberkette, I think, are the two lawyers that said, yes, this complies with 19B. And stipulated savings are allowable. That's in the transcripts of the board meetings. It's not like they discovered some miraculous inside information that wasn't known to the school board. This isn't about shedding light on the mushrooms of transparency in state government or municipal government. This is about making money. Someone getting cut into a parasitic plaintiff. If I can interrupt you again. I just simply want to know. Isn't the only inquiry here in terms of whether or not the public disclosure bar operates to preclude this type of claim, whether or not plaintiffs had in hand the information that it claims constitutes fraud by way of a FOIA request here, or by way of the school board's website? If the information that they had in hand came from those two sources, no matter that it arguably was initially hidden from view, isn't the timing of it when the complaint was filed as to whether or not the public disclosure bar operates? That is our position. We think it's irrelevant whether an individual board member knew it or didn't know at the time that the contract was signed. What's important is, at the time the relators filed suit, all this information was disclosed before they filed. It doesn't mean they weren't involved in getting it disclosed. It means they can't profit from the disclosure. That's what we're talking about. FOIA is not somehow impacted in this case, as they argued. You still get the information. What you can't do is profit from the information. You can bring it to light, but you can't put cash in your pocket once you bring it to light. As long as anybody could have filed the same FOIA request and got the same information, that doesn't make them an insider. That's exactly what happened here. There's quotes in the deposition that they reviewed 30 Amarantzville contracts. They just FOIA'd until they found what they wanted. Because Xander was working part-time with Paul Chatman. No, he was not. He was working at an independent, not-for-profit organization that was reviewing what was going on. Trying to find out what they thought was bad things going on at Paul Chatman. He was not. So then he starts going through a bunch of Paul Chatman documents. Documents. MS searches. I don't want to misspeak, but as to Chatman, Your Honor, let me get what they... And it's interesting because they cited all this public information in their complaint as well. As to Chatman, they say they got their information from FOIA responses from Chatman. The Chatman School District's website, which is also used under the Public Disclosure Bar. That's public information. From Open Meetings Act FOIA litigation. It's compelled. In addition, that is a public source. It bars you from using it once it's public knowledge. And from publicly available documents on board docs. And from board meeting minutes, videotapes, and tapes. It's all public information. And they went to CMS to get some documents. I don't remember the CMS, Your Honor. A state... They went to the Board of Education. I think that was for Taylorville. Taylorville, they don't make any of these arguments. They just FOIA'd it. They aren't insiders. They have no relationship. They saw Amherst had a contract with Taylorville. They FOIA'd it. Got the response. Looked at a website. Filed suit. Paul Chatman was filed first. Yes, Your Honor. And then they amended and added Taylorville. So then they start looking for other school districts that might have contracts with Amherst. We believe the timing was before that. But we didn't get into that because it's a jurisdictional bar. So we didn't get into the facts that are hotly contested. Whether these are true 19B contracts or not. I'm telling you, it's factually discreet. It's when he sits up here and says they don't comply. Brown, Haynes, Stevens, the lawyers for the state, for the bar. Excuse me, Kevin. School board says it does. And that's in a transcript of a board meeting. The issue here, though, is whether they comply or not. If it's a public disclosure bar, then the False Claims Act doesn't apply. Exactly. We think the circuit court got it right. That it's a jurisdictional bar. You can't go shopping or FOIA hunting and get this information and not be an insider. Excuse me. Yes. May I interrupt? You said a jurisdictional bar. Yes. I've got to digress here for a minute because I know that the trial court, in its order, indicated that it was granting summary judgment and dismissing with prejudice for lack of subject matter jurisdiction. And I just question whether or not that was a proper determination. How did the circuit court not have subject matter jurisdiction of this litigation? According to the Lyons case, which is cited by relators, it says this is a jurisdictional bar. Okay. Let's go to Lyons. Okay. Lyons is another Illinois appellate court case, and it relied on Beeler, Shad, and Diamond versus Target. You go to Beeler, Shad, and Diamond and what it said, and it's relying on a federal case. And it's actually a line of federal cases. You've got Fallon, and you've got Fine. These are federal court cases, and you have Glazer. And it's important to remember federal courts are courts of limited jurisdiction. Illinois circuit courts are courts of general jurisdiction. This isn't a jurisdictional issue. And I'm just going to suggest to the parties here that that statement in Lyons Township about the four inquiries that must be conducted to determine whether it has jurisdiction might be an appropriate inquiry in federal court where Plaintiff has to establish subject matter jurisdiction in order to plead a case. State court, that's not what we're dealing with. Even if that's the case here, Judge, I believe that it still bars the action. It doesn't bar subject matter jurisdiction. It's not jurisdictionally barred. It's barred because of the application of the public disclosure bar, and they don't fall within any of the exceptions of being an original source. And that's something different. That's summary judgment as opposed to a dismissal. Well, this is summary. It was on a summary judgment argument that that order was entered by the circuit court. I understand. So you're saying summary judgment was appropriate. Disregard whatever possibly extraneous language was used about this being a dismissal for lack of jurisdiction. Correct, Your Honor. We think it squarely falls within the parameters of a parasitic case. In order to get around that, they're asking you to legislate from the bench. It's a state report. All the case law says it's a state report. In fact, the Lyons case says it's a state report because it was provided by the government and they're being defrauded. If I could just summarize. Or do you have other questions? Quickly. I'm sorry. Very quickly. Yes, Your Honor. You're eating co-counsel's time. Yes, there are numerous grounds to affirm summary judgment and for the entry of the motion to bar the evidence. Thank you, Your Honor. Thank you, Mr. Herman. Mr. Turner. Good morning, Your Honor. As counsel, may it please the Court. I'm Christopher Turner, the Assistant Attorney General here on behalf of the appellee, the Attorney General for the State of Illinois. This Court should affirm the circuit court's holdings in its orders that the Attorney General has sole authority under Section 4 of the Illinois False Claims Act to oppose the dismissal of key TAM actions that would otherwise be precluded by the Act's public disclosure requirement. Now, that is the only question which the Attorney General is here to address. We submitted the Statement of Interest on that narrow question of statutory construction and we just want to make sure the Court rejects the relator's position just as to this issue. We have no position on the merits of other sites' claims, defenses, or any of the other positions that take place. To the extent that the relator has argued that the Act would grant the local government entities, such as the school districts that issue, in this case, control over key TAM litigation, by allowing them to unilaterally veto the dismissal of such claims when they should otherwise be barred under the Act. As the Supreme Court recognized in sketching the UBS Financial Services, the plain terms of the Act in its plain language grants the Attorney General, in all circumstances, control over key TAM litigation under its provisions. And so, accordingly, the Act's public disclosure bar only authorizes the Attorney General, the sole legal officer for the State, to veto the dismissal of litigation under that provision. Now, counsel for the relators was kind of really mischaracterized their claim here to the extent that he called it a claim solely on behalf of the defrauded government entities. That isn't the case. It's under the Act that the cause of action belongs to the State. It belongs to the State in its entirety. That is what the sketchee recognized when he explained that the Attorney General who has had sole control and was the sole officer of the State. And that's the plain terms of the Act reflect, whether it's the definition of the State, which isn't the State. It doesn't define it as what is a defrauded local entity. It is the State. It is the State of Illinois. Any of its agencies, its departments, its authorities, its municipalities, any local unit of government, school districts, and any combination of those. It uses the conjunction and. It's because it is the entirety of those. And the reason it has that broad definition is just to clarify the scope of liability, the scope of the claim that it provides to the State. It's for fraud on any of those units, including the political subdivisions of the State. As the Supreme Court recognized in the decision that we cited in our brief, people like Hartigan, the E&E Hauling Company, and also Sketchee actually courted for the same principle. The State of Illinois has an interest in all of the property of all of its political subdivisions. So in the Hartigan v. E&E Hauling case, the court found that the Attorney General, through the State, has standing to bring a common law action for fraud on behalf of the State to address fraud that is perpetuated against a municipal authority. It does have a standing to address any fraud against any political subdivision. And that interest is codified in the False Claims Act. It's reflected, as I said, in the definition of the State itself, but it's also reflected in the other terms. The subsection A of Section 4 of the Act, which creates the cause of actions, is titled Responsibilities of the Attorney General and the Illinois State Police. Those are the only two parties which can reinvestigate and bring actions under the Act, except to the extent, under subsection B, that private parties can bring their QTAM actions. That is, the QTAM actions are on behalf of themselves and, specifically, I believe it's 4B1, for the State. That is, the actions are always being brought on behalf of the State for the State. If the State is successful, it's left explicit, both in 4B and 4D, that it is entitled to any reasonable expenses and costs incurred by the Attorney General because the Attorney General is the only lawyer for the State. They're the only party that can bring the action for the State. The public disclosure bar itself, under subsection E, E4A, it provides, it specifies that the bar applies except to actions brought by the Attorney General. And that's, again, recognizing that the Attorney General is the only entity who can represent the party who would otherwise bring a cause of action under the Act. If the State is successful, or even if the lawyer is successful, the liability is owed to the State. That treble damages and the civil penalties are owed to the State. They're not owed to the defrauded government entity, if that's what's at issue, or a program. Under section 8 of the Act, you can see this spelled out. All the money goes into a State whistleblower fund under the custodial control of the State Treasurer. Automatically, a third of that fund is allocated to special funds within the State Treasury, for State law enforcement purposes. This is all under section 8. One-sixth goes to a fund for the Illinois State Police, one-sixth for a fund controlled by the Attorney General, but they're within the State Treasury. The remainder of the fund, de facto, will revert to the Illinois General Revenue Fund, again, except that the Court still has its discretion to carry out the terms of the Act to pay out any of the monies from that remaining two-thirds. The one it specifies is, of course, Q10 actions like this one, where if a relator is successful in their plan, they may be entitled to a portion of the funds. In addition, under section 4, subparagraph A, section 48, the Circuit Court has the discretion. It may allocate an appropriate portion of that money to the government program or a government entity that was adversely affected by the offending. So they may get some money. The Court has discretion to award a piece of any proceeds. But the proceeds first go to the State. At least a portion of them will be given to the State Treasury. And de facto, all of them go to the State Treasury. And that's because these actions are brought on behalf of the State. Even if they're addressing fraud against a local entity, such as the school districts here. And in such actions, as the plain language of the Act reflects, only the Attorney General can legally represent the State. Only the Attorney General can intervene to dismiss a case. The Attorney General specifically, actually, identifies it as required by written consent if a relator wants to voluntarily dismiss their action. But as the Scaccitti case reflects, as it goes through the provisions of the Act, it's the Attorney General, every time he refers to the State, controlling the case, the State intervening in the case to dismiss the case, over the objections of the relator, if the relator originally has to provide notice to the State of the action before it can be filed and then unsealed and pursued. So the State has the opportunity to elect to take over the case. It is the State. It is the State as represented by the Attorney General. In this case, the relators didn't provide their notice just to the school districts. They provided their notice beforehand to the Attorney General's office, because that was what was required. And it was the Attorney General who then appeared in the case and declined to take over the case on behalf of the State, pursuant to the provisions of the Act. Consistent with this use of the State throughout the Act, when the public disclosure bar provides that if something, sorry, if a action, a QTAM action, must be dismissed under its provisions unless opposed by the State, that that reference to the State refers, consistent with those other references to the State, to the State who has the claim as represented by the Attorney General. As Your Honor pointed out, the alternative reading that local government entities, if they're somehow involved, can unilaterally come in and take control of the QTAM litigation, for instance, in this case, it would end up sort of turning the whole thing into a very confusing, as well as unconstitutional mess. If local government entities could come in, such as the school districts, and unilaterally intervene to try to dismiss the action under the relator's objection, for instance, or if they could just pursue their action without ever providing the Attorney General with notice of the action in the first place so the Attorney General wouldn't even know it, even though it's been appointed as a steward of these claims, as the Supreme Court recognized, one who maintains control over these claims at all times would not even know about the action under the relator's reading of the Act. So we ask, unless the Court has any questions for me, we just ask that the Court, to the extent that whatever it does affirms or reverses the orders below, that it does affirm the whole thing, that the Act grants sole authority to the Attorney General to oppose QTAM, to dismissal of QTAM actions under the Relative Disclosure Act. I see no questions. Mr. Turner, thank you. Mr. Craven. Thank you, Your Honor.  if I ask one of my kids, what did you do, and they only give me half the story, somebody did something wrong, and the other half they swore. In this case, you ask for the contract, and all you get is the first part of the contract. You don't get the schedules, where school boards are asked to stipulate away every taxpayer protection that's found in Section 19b. The bond, the periodic payments, the measurement of savings, and the requirement of Mayfair payments if those savings don't meet the costs of the contract. Not only do they not give it to you when you ask, they then hide it from you, and they ask the school superintendent to take it off of a public website so that nobody can see it, while the same school superintendent who is down in Texas making sales calls for you. They have someone show up at the school board meeting when it's time to ask the school board to approve this, and they make the pitch to the school board, leaving out the part about the stipulated savings and the waiver of the bond and all those other things, and they tell you, if the savings don't match the expenses, we write you a check, as 19b requires. As a parent, something smells here, and we found it, and we found it in Taylorville, with the $11 million change on a $100,000 contract. If there's nothing wrong with what Amoresto is doing, why not just give everybody the contract? Why not give everybody the schedules? Why file an action for a temporary restraining order in joining these plaintiffs from using the Freedom of Information Act to discover other contracts? If it's all okay, just put it on the table. If it's all okay, why not give Brown v. Stevens the contract and the schedules to review? We've got an instance here where a contract was approved by a school board subject to legal review. Two million dollars in payments were made pursuant to that contract. Legal review happened four years later. Was there a contract? Was there legal authority to present those invoices to the Chatham School District in the absence of the required legal review according to the school board's memo? I think not. I think the facts of this case require this court to determine that the public disclosure bar is not automatically filled in when someone makes a four-year clause. And as to, as I say in Mr. Kennedy's argument fully, the state means state. In line one, the state means state in line two and in line three and in line four. That's it from me, Your Honor. Thank you, Mr. Kennedy. I take this matter under advisement. We'll be in recess. Thank you, counsel.